FILED
2015 Sep-30  PM 05:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JUDSON A. LOVINGOOD,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:14-cv-00684-MHH** |
| | } | |
| **DISCOVERY** | } | |
| **COMMUNICATIONS, INC., et al.,** | } | |
| | } | |
| **Defendants.** | | |

## <u>MEMORANDUM OPINION</u>

"The Challenger Disaster," a popular 2013 film, chronicled the events leading up to the tragic crash that destroyed The Challenger spacecraft in 1986 and killed its entire crew.  A scene in the film depicts Judson Lovingood, a NASA engineer, testifying in front of the Presidential Commission that investigated the disaster.  Mr. Lovingood contends that the film defames him and paints him in a false light.  Mr. Lovingood brought this defamation lawsuit against the defendants Discovery Communications Inc., The Science Channel, The Discovery Channel, the British Broadcasting Corporation, The Open University, and Kate Gartside for their roles in writing, producing, and broadcasting the film.[1]  The Discovery Channel, Discovery Communications, Inc., and the Science Channel (hereinafter

---

[1] During the oral argument on defendant The Open University's motion to dismiss, the plaintiff conceded that The Open University was due to be stricken as a defendant in this action, and the Court granted The Open University's motion to dismiss.  (Doc. 30).

"Discovery") have jointly filed a motion to dismiss the complaint for failure to state a claim. (Doc. 6). BBC has filed a motion to dismiss for lack of personal jurisdiction and failure to state a claim (Doc. 14), and Kate Gartside has filed a motion to dismiss for lack of personal jurisdiction and insufficient service of process (Doc. 32). For the reasons discussed, the Court denies Discovery's motion to dismiss, grants BBC's motion to dismiss, and grants Ms. Gartside's motion to dismiss.

## I.   STANDARDS OF REVIEW

### A.   12(b)(6)

Rule 12(b)(6) enables a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Pursuant to Rule 8(a)(2), a complaint must contain, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Generally, to survive a [Rule 12(b)(6)] motion to dismiss and meet the requirement of Fed. R. Civ. P. 8(a)(2), a complaint need not contain 'detailed factual allegations,' but rather 'only enough facts to state a claim to relief that is plausible on its face.'" *Maledy v. City of Enterprise*, 2012 WL 1028176, at *1 (M.D. Ala. Mar. 26, 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "Specific facts are not necessary; the statement needs only 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

In deciding a Rule 12(b)(6) motion to dismiss, a court must view the allegations in a complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).  A court must accept well-pleaded facts as true.  *Grossman v. Nationsbank*, *N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000).

### B.     12(b)(2)

"A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'"  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)).  "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction."  *Mazer*, 556 F.3d at 1274 (internal quotation marks and citations omitted).  To survive a motion to dismiss for lack of personal jurisdiction, the non-moving party must "present[] enough evidence to withstand a motion for a directed verdict."  *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).  A motion for a directed verdict must be denied where

"there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions." *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). Although defendants may submit affidavits in support of 12(b)(2) motions, the Court must construe all reasonable inferences and factual conflicts in favor of the non-moving party. *Stubbs*, 447 F.3d at 1360.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Launched in 1986, the Space Shuttle Challenger came apart shortly after takeoff in a crash that killed the shuttle's seven crew members. (Doc. 1-1, ¶ 2). Plaintiff Judson Lovingood was working as the NASA-MSFC Shuttle Projects Office Deputy Manager when the Challenger disaster occurred. (Doc. 1-1, ¶ 1). President Ronald Reagan established a Presidential Commission to investigate the accident. (Doc. 1-1, ¶ 2). The Commission completed its investigation and released a report in June 1986. (Doc. 1-1, ¶ 2). Dr. Richard P. Feynman, a Nobel Laureate and Cal Tech physics professor, served on the Commission. (Doc. 1-1, ¶ 2). Dr. Feynman wrote a book about the experience entitled "What Do You Care What Other People Think" that was published in 1988. (Doc. 1-1, ¶ 2).

Dr. Feynman's book provided the basis for a film entitled "The Challenger Disaster." The film debuted on The Science Channel and The Discovery Channel in the United States in 2013. (Doc. 1-1, ¶¶ 3-4). The film was broadcast to

4

approximately 2 million "premiere viewers" and 5 million "unique viewers," making it one of the most watched programs in the history of the Science Channel. (Doc. 1-1, ¶ 3).  The film begins with the following message displayed in bold print: "THIS IS A TRUE STORY."  (Doc. 1-1, ¶ 4).  The introductory text indicates that the film is based on Dr. Feynman's book.  (*Id.*).  Like the book, the film concerns the events leading up to the Challenger disaster.  (Doc. 1-1, ¶¶ 2, 4).  The film features actors playing the roles of Dr. Feynman and Judson Lovingood. (Doc. 1-1, ¶ 3).

In his complaint, Mr. Lovingood alleges that "[p]ertinent and significant aspects of [the film] are not true . . . and are, in fact, false and defamatory."  (Doc. 1-1, ¶ 4).  Mr. Lovingood asserts that the writers and producers of The Challenger Disaster sacrificed the truth and defamed Mr. Lovingood in an effort to make a more dramatic film.  (Doc. 1-1, ¶ 4).  The film shows NASA engineers assessing the probability of total mission failure and loss of the entire crew, when in reality, the engineers had assessed failure probabilities only with respect to "the separate components of [the] complex shuttle."  (Doc. 1-1, ¶ 6).  The film "failed to make the very significant distinction among probability estimates for [the various components] . . . and twisted evaluations that NASA had determined for the components into a false picture of probability of total mission failure with loss of life to the crew."  (Doc. 1-1, ¶ 6).

One sequence of The Challenger Disaster shows the actor playing Mr. Lovingood and another NASA employee testifying before the Presidential Commission. (Doc. 1-1, ¶ 7). Dr. Feynman asks the other NASA employee: "Can you remind me what NASA calculates the probability of shuttle failure to be? Failure meaning the loss of vehicle and the death of the entire crew." (Doc. 1-1, ¶ 7). After Dr. Feynman's question, an actor playing another member of the Presidential Commission asks Mr. Lovingood to answer the question, and Mr. Lovingood responds that the probability is 1 in 100,000. (Doc. 1-1, ¶ 7). Dr. Feynman responds, stating that Mr. Lovingood's calculation is "a wish," rather than a true estimate, and that NASA's own engineers estimated the probability of failure to be close to 1 in 200. (Doc. 1-1, ¶ 7). The sequence's "clear statement and depiction was that Lovingood had lied about the probability of total failure being 1 in 100,000 when NASA's own engineers had said it was 1 in 200." (Doc. 1-1, ¶ 7, p. 7).

Mr. Lovingood alleges that he never testified in person before the Commission or offered Dr. Feynamn an estimate of total shuttle failure. (Doc. 1-1, ¶ 7). Mr. Lovingood also alleges that no engineer ever calculated the probability of total shuttle failure at 1 in 200 and that Dr. Feynman's book correctly described an engineer offering a 1-in-200 probability assessment when asked about the failure of a particular component. (Doc. 1-1, ¶ 7). Mr. Lovingood contends that

the film paints him in a false light because the film suggests that "NASA and Lovingood knew this made-up [1-in-200] calculation before th[e] terrible Challenger disaster and ignored it" (Doc. 1-1, ¶ 7, p. 9), "present[ing] a danger to the astronauts who were not told of such a high probability of failure." (Doc. 1-1, ¶ 7, p. 8).

Mr. Lovingood alleges that Discovery Communications, Inc. and BBC Films jointly produced The Challenger Disaster, Kate Gartside wrote the script for the film, and The Discovery Channel and The Science Channel later broadcast the film. (Doc. 1-1, ¶ 8). Mr. Lovingood asserts defamation and invasion of privacy claims against all of the defendants. (Doc. 1-1, ¶ 10). All of the defendants ask the Court to dismiss Mr. Lovingood's claims. (Docs. 6, 14, 32). The parties have briefed the motions. (Docs. 7, 10, 12, 15, 21, 29, 33). On this record, the Court considers the defendants' motions.

### III. ANALYSIS

#### A. Discovery's 12(b)(6) Motion to Dismiss

##### 1. Defamation Claim

To establish a prima facie case of defamation under Alabama law, "a plaintiff must show: [1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se)

or actionable upon allegations and proof of special harm (actionable per quod)."
*Ex Parte Bole*, 103 So. 3d 40, 51 (Ala. 2012) (quoting *Ex parte Crawford Broad.
Co.*, 904 So. 2d 221. 225 (Ala. 2004) (emphasis and internal quotation marks
omitted)).

Discovery argues that Mr. Lovingood's complaint fails to state a defamation
claim because: (1) the statements made in the film are not "of and concerning" Mr.
Lovingood; (2) the statements are substantially true; (3) the statements are not
defamatory as a matter of law; and (4) Mr. Lovingood did not plead special
damages. (Doc. 7, pp. 6, 11, 19, 22). Discovery also argues that Mr. Lovingood's
claim for punitive damages is barred because he failed to send a written demand
for a retraction before filing this lawsuit. (Doc. 7, p. 24). The Court addresses
these arguments in turn.

### i.

With respect to Discovery's argument that statements in the film are not "of
and concerning" Mr. Lovingood, the Challenger Disaster film depicted Mr.
Lovingood testifying under oath before the Presidential Commission. The film
identifies Mr. Lovingood by name. That Mr. Lovingood testified about NASA's
work does not mean the statements in the film concern only NASA. The film
suggests that Mr. Lovingood lied or attempted to cover up a "high probability [of]
failure by giving a 1 in 100,000 probability of total mission failure." (Doc. 1-1, p.

8).  The suggestion that Mr. Lovingood lied or at least grossly understated the probability-of-failure estimate impugns not only the organization for which Mr. Lovingood worked.  The statements concern Mr. Lovingood as an individual.

Discovery relies on *New York Times v. Sullivan*, 376 U.S. 254 (1964) and *Rosenblatt v. Baer*, 383 U.S. 75 (1966) to argue that the statements in the film concern only NASA as an organization, not Mr. Lovingood (Doc. 7, p. 8); however, those cases suggest the opposite result.  In *Sullivan*, the Supreme Court held that a city commissioner could not recover under a defamation theory when the allegedly defamatory statements were made solely about the police department that the city commissioner helped oversee.  376 U.S. at 292.  The alleged defamation in *Rosenblatt* concerned criticism of a government agency and included no specific reference to the plaintiff.  383 U.S. at 80-83.  Discovery's reliance on these cases is unpersuasive because the publications at issue in *Sullivan* and *Rosenblatt* allegedly defamed the plaintiff organizations and did not identify the plaintiffs by name.

In this case, the alleged defamation is personal to Mr. Lovingood.  Mr. Lovingood has pleaded that the statements in the film were "of and concerning" him.  The film portrays Mr. Lovingood—identified by name while under oath—underrepresenting NASA's probability-of-failure estimates for the Challenger mission, thereby suggesting that Mr. Lovingood attempted to manipulate the

Commission's investigation.  (Doc. 7-2, pp. 22-23).  Viewing the allegations in the complaint in the light most favorable to Mr. Lovingood, the Court finds that Mr. Lovingood has alleged adequately that the statements at issue concerned him.

### ii.

As for Discovery's argument that the statements at issue are substantially true, "[t]ruth is a 'complete and absolute defense' to defamation." *Ex Parte Bole*, 103 So. 3d at 51 (quoting *Battles v. Ford Motor Credit Co.*, 597 So. 2d 688, 692 (Ala. 1992)).  A "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991). Statements that are "substantially correct," meaning that they are true in all material respects, are not actionable.  *Drill Parts & Service Co. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1290 (Ala. 1993); *Kirkpatrick v. Journal Pub. Co.*, 97 So. 58, 59 (Ala. 1923).  "In actions for libel or slander, the defendant ultimately bears the burden of showing that the defamatory words are true."  *Crutcher v. Wendy's of North Alabama, Inc.*, 857 So. 2d 82, 95 (Ala. 2003) (citing *Brothers v. Brothers*, 94 So. 175 (Ala. 1922)).

Mr. Lovingood alleges in his complaint that the statements in the film are not substantially true.  Mr. Lovingood asserts that he did not make the statements attributed to him in the film and that the statements were not substantially true in

material respects—namely, that he never lowballed the probability of total-mission failure to the Commission or to NASA engineers.  (Doc. 1-1, p. 9).  The film, however, depicts Mr. Lovingood doing just that.  (*See* Doc. 7-2, pp. 22-23).  The cases cited by Discovery—in which courts upheld grants of summary judgment to various defendants on the "substantial truth" issue—are unpersuasive, particularly with respect to the pending 12(b)(6) motion.  In context, the statements that Mr. Lovingood describes in his complaint contain more than a minor inaccuracy. Rather, the statements suggest that Mr. Lovingood misled the Presidential Commission, officials at NASA, and the astronauts aboard the Challenger about the risks involved in the mission.  Thus, the Court finds that Mr. Lovingood has adequately pled that the statements at issue are not substantially true.

### iii.

Turning to Discovery's argument that the statements at issue are not defamatory as a matter of law, the Court must consider whether the statements are "reasonably capable of defamatory meaning."  *Clark v. America's First Credit Union*, 585 So. 2d 1367, 1370 (Ala. 1991) (citing *Harris v. School Annual Pub. Co.*, 466 So. 2d 963, 964-65 (Ala. 1985)).  A communication is defamatory if it "'[so] harms the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'"  *Clark*, 585 So. 2d at 1370 (quoting *Harris*, 466 So. 2d at 964).

11

The statements in question are reasonably capable of defamatory meaning. Mr. Lovingood states in his complaint: "As a proximate consequence [of the statements], Plaintiff has had his character and reputation impaired and made the subject of ridicule, contempt and scorn in the scientific community, his own community, and among the viewers of the movie throughout the United States and abroad due to the tragic disaster of the Challenger and the false characterization of Plaintiff as a weak, uninformed, manager who callously ignored engineers reports at NASA that endangered the lives of astronauts in the shuttle program." (Doc. 1-1, p. 11). While the disputed portion of the film might be susceptible to multiple meanings, the defamatory meaning that Mr. Lovingood ascribes to The Challenger Disaster film is a reasonable, plausible one. Taking the alleged statements in the light most favorable to Mr. Lovingood, the Court finds that the statements are reasonably capable of a defamatory meaning

### iv.

Discovery argues that because the published statements require additional facts to understand why they might be defamatory, Mr. Lovingood's failure to plead special damages is fatal. Mr. Lovingood counters by arguing that the statements are actionable per se and that Alabama law presumes damages for false, defamatory statements. (Doc. 10, p. 21).

"In cases of libel, if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation, and pronounces it actionable per se." *Butler v. Town of Argo*, 871 So. 2d 1, 16 (Ala. 2003) (quoting *Ceravolo v. Brown*, 364 So. 2d 1155, 1156-57 (Ala. 1978)).  A statement that is libelous per quod is not libelous on its face and instead is actionable only by reference to "extrinsic facts showing circumstances under which" the statement was published.  *Cottrell v. Nat'l Coll. Athletic Ass'n*, 975 So. 2d 306, 346 (Ala. 2007).  "In the absence of language that is defamatory per se, a plaintiff must allege and prove special damages resulting from the defamation."  *Clark v. America's First Credit Union*, 585 So. 2d 1367, 1371 (Ala. 1991).

Mr. Lovingood has adequately pleaded that the statements in question were libelous per se, and thus, he does not have to plead special damages.  The film depicts Mr. Lovingood giving false, sworn testimony to a Presidential Commission regarding the probability of a total-launch failure.  As stated in the complaint, such statements have directly exposed Mr. Lovingood to public ridicule.  Additionally, viewing the alleged facts in the light most favorable to Mr. Lovingood, the depicted false, sworn testimony to the Commission is tantamount to the accusation of a crime—namely, perjury.  The context of the statements in the film provides additional support for this view.  In the film, a member of the Presidential

13

Commission, responded to Mr. Lovingood's assessment by stating: "One in two hundred.  Wow.  That's not what the astronauts were aware of."  (Doc. 7-2, p. 23). No extrinsic information or inferences are necessary to understand the defamatory nature of these statements.

Because the film's statements expose Mr. Lovingood to public ridicule and contempt and are tantamount to an accusation of crime, Mr. Lovingood has pleaded libel per se.  Thus, Mr. Lovingood is not required to plead special damages.

### v.

Discovery argues that Mr. Lovingood is barred from recovering punitive damages because he failed to allege that he sent Discovery a request for a retraction.  Alabama Code § 6-5-186 provides that:

> punitive damages shall not be recovered in any action for libel on account of any publication unless . . . (2) it shall be proved that five days before the commencement of the action the plaintiff shall have made written demand upon the defendant for a public retraction of the charge or matter published; and the defendant shall have failed or refused to publish within five days, in as prominent and public a place or manner as the charge or matter published occupied, a full and fair retraction of such charge or matter.

Mr. Lovingood states in the complaint: "Plaintiff wrote the Science Channel on November 19, 2013, to complain about the falsehoods in the movie.  No response was made to this letter."  (Doc. 1-1, ¶ 11).  During discovery, facts may come to light that establish that Mr. Lovingood failed to comply with the

requirements of section 6-5-186; but construing the complaint in the light most favorable to Mr. Lovingood, the complaint indicates that he complied.   Mr. Lovingood's complaint "about the falsehoods in the movie" plausibly may have included a demand for public retraction.   That Discovery did not respond to Mr. Lovingood's letter suggests that Discovery did not publish a retraction.   If evidence reveals that Mr. Lovingood failed to send the retraction letter, then he will not be able to recover punitive damages.   For now, however, Mr. Lovingood has pleaded sufficient facts for his punitive damages claim to go forward.

### 2.  "False Light" Invasion of Privacy

Alabama has adopted the following definition for "false light" invasion of privacy:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Butler*, 871 So. 2d at 12 (quoting Restatement (Second) of Torts § 652E (1977)). "[U]nlike defamation, truth is not an affirmative defense to a false-light claim; rather, 'falsity' is an element of the plaintiff's claim, on which the plaintiff bears the burden of proof."  *Regions Bank v. Plott*, 897 So. 2d 239, 244 (Ala. 2004) (emphasis omitted).

Discovery contends that the Court should dismiss Mr. Lovingood's false light claim because the statements in the film were substantially true and did not concern Mr. Lovingood. (Doc. 7, pp. 25-26). The Court already has ruled with respect to Mr. Lovingood's defamation claim that Mr. Lovingood has adequately pleaded falsity and that the alleged defamatory statements concern Mr. Lovingood. Mr. Lovingood's complaint also satisfies the remaining elements of false light. The false light in which Mr. Lovingood was placed—that is, misrepresenting crucial facts to the Commission and appearing to cover up details of the launch that could have saved the crew members' lives—would certainly be highly offensive to a reasonable person. Additionally, the allegations in the complaint, if proven, establish that Discovery was aware of both the publicized matter's false nature and the false light in which Mr. Lovingood would be placed. Thus, the Court denies Discovery's motion to dismiss the false light claim.

## B.     BBC's and Kate Gartside's 12(b)(2) Motions to Dismiss for Lack of Personal Jurisdiction

In determining whether to exercise personal jurisdiction over a foreign defendant, a federal court must consider (1) whether the exercise of jurisdiction is permitted by the state long-arm statute, and (2) whether the exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Mazer*, 556 F.3d at 1274. Here, the two inquiries merge because "Alabama's long-arm statute permits service of process to the fullest

extent constitutionally permissible." *Sloss Indus. Corp. v. Eurison*, 488 F.3d 922, 925 (11th Cir. 2007) (citing Ala. R. Civ. P. 4.2(b)).

For a court to satisfy due process in exercising personal jurisdiction over an out-of-state defendant, the defendant must have "certain minimum contacts with the [forum] State such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted). *International Shoe*'s conception of "fair play and substantial justice" gave rise to two categories of personal jurisdiction: (1) general jurisdiction, and (2) specific jurisdiction. *Daimler*, 134 S. Ct. at 754. General jurisdiction "refers to the power of a court in the forum to adjudicate any cause of action involving a particular defendant, irrespective of where the cause of action arose." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 n.27 (11th Cir. 2009). Specific jurisdiction "refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum." *Id.*

### 1.    General Jurisdiction

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them

essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011).   Outside of exceptional cases, a corporation is considered "at home" in either its place of incorporation or its principal place of business.   *Daimler*, 134 S. Ct. at 760, 761 n. 19.   "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile."   *Goodyear*, 131 S. Ct. at 2853.

## 2.   Specific Jurisdiction

In specific jurisdiction cases, the Eleventh Circuit applies a "three-part due process test, which examines: "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'"   *Louis Vuitton*, 736 F.3d at 1355 (citations omitted).   The plaintiff bears the burden of establishing the first two prongs, after which the burden shifts to the defendant to make a "compelling case" that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.   *Id.*   (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

As to the first prong, the Court's "inquiry must focus on the direct causal relationship between the defendant, the forum, and the litigation." *Louis Vuitton*, 736 F.3d at 1355-56.   As to the second prong, the Eleventh Circuit has two applicable tests in intentional tort cases. *Id.* at 1356.   First, the Eleventh Circuit may apply the "effects test," which the Supreme Court articulated in *Calder v. Jones*, 465 U.S. 783 (1984).   Under the effects test, a single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state, if the tort "(1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* at 1356 (internal quotation marks omitted).   Second, the Eleventh Circuit may apply the traditional minimum contacts test for purposeful availment, which asks whether the defendant's contacts: "(1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Id.* at 1357-58 (citing *S.E.C. v. Carillo*, 115 F.3d 1540, 1542 (11th Cir. 1997)).

### 3. BBC's Motion to Dismiss

Mr. Lovingood's complaint does not allege sufficient facts to make out a prima facie case of personal jurisdiction over BBC.   The complaint's only

references to BBC state that BBC helped produce, and retained the copyright for, the film at issue.   (Doc. 1-1, pp. 10-11).   The complaint contains no facts suggesting that BBC is "essentially at home" in Alabama or that BBC has had any contacts with Alabama, let alone "minimum" contacts.   Notwithstanding Mr. Lovingood's failure to meet his initial burden of establishing jurisdiction over BBC, BBC has submitted affidavit evidence in support of its position.   (Docs. 15-1, 15-2).   Mr. Lovingood has not submitted evidence in response to BBC's affidavits.

The Court may not exercise general personal jurisdiction over BBC.   BBC is not incorporated in Alabama, and it does not have its principal place of business in Alabama.   (Doc. 15-1, ¶¶ 2, 4).   In fact, BBC does not have any business offices in Alabama.   (Doc. 15-1, ¶ 5).   Mr. Lovingood's basis for asking the Court to exercise general jurisdiction over BBC is that BBC distributes its World Service radio station over the SiriusXM Satellite Radio service.   (Doc. 21, p. 3 n.2).   Mr. Lovingood explains that "it would not be unreasonable to assume that SiriusXM has tens of thousands of subscribers in Alabama alone."   (Doc. 21, p. 3 n.2).   However, broadcasting a program over satellite radio is not a sufficient contact to render BBC "essentially at home" in a state that is neither its place of incorporation nor its principal place of business.   The Supreme Court has made clear that "continuous activity of some sorts within a state is not enough to support the

demand that the corporation be amenable to suits unrelated to that activity." *Daimler*, 134 S. Ct. at 757 (quoting *International Shoe*, 326 U.S. at 318).  To hold such would subject BBC to general jurisdiction in all fifty states, which is incompatible with the Supreme Court's decisions in the area of general jurisdiction.  *See, e.g.*, *Goodyear*, 131 S. Ct. at 2856-57.  Because BBC's contacts with Alabama are not so "continuous and systematic" so as to render it "essentially at home" in Alabama, the Court may not exercise general personal jurisdiction over BBC.

Additionally, the Court may not exercise specific personal jurisdiction over BBC.  BBC has not purposefully availed itself of the privilege of conducting activities in Alabama.  Applying the effects test, Mr. Lovingood fails to establish the second and third factors because BBC's alleged torts were not directed at Alabama and did not cause a harm that BBC should have anticipated would be suffered in Alabama.  The record indicates that BBC did not broadcast the film in the United States; rather, BBC's television broadcast of the film aired only in the United Kingdom.  (Doc. 15-1, ¶¶ 13-14).  If BBC's broadcast of the film did reach viewers in the United States—or more specifically, in Alabama—it was not the product of any purposeful or intentional act on BBC's part.

Mr. Lovingood also fails to satisfy the minimum contacts test.  BBC made two phone calls to individuals in Alabama during the production of The Challenger

Disaster film to "obtain some background information from [The Marshall Space Flight Center]." (Doc. 15-2, ¶ 4). The two phone calls—both of which were unrelated to Mr. Lovingood—are too attenuated to warrant the exercise of specific jurisdiction. *See, e.g.*, *Walden*, 134 S. Ct. at 1123 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State.") (internal quotation marks omitted).

Relying on *Calder*, Mr. Lovingood argues that BBC's intentional torts occurred in Alabama, giving BBC fair notice that it might be haled into an Alabama court. (Doc. 21, p. 8). However, the defendants' contacts with the forum state in *Calder* were far greater than BBC's contacts with Alabama. In *Calder*, the defendants made multiple phone calls to California sources while writing a story about a California citizen's activities in California. 465 U.S. at 788-89. In *Calder*, "California [was] the focal point both of the story and of the harm suffered." *Id.* at 789. Alabama was in no sense a focal point of BBC's part in writing the script for and producing the film. The film depicts activities that occurred almost entirely outside of Alabama, including the statements in controversy. As BBC points out, BBC had no reason to know that any of the persons depicted in the film live or work in Alabama. (Doc. 29, p. 11). BBC did not avail itself of any privileges of

doing business within Alabama; and in fact, the record indicates that BBC did not do any business within Alabama. Given the lack of evidence indicating that BBC purposefully directed activity toward Alabama, the Court may not exercise specific jurisdiction over BBC. The Court will grant BBC's motion to dismiss.

### 4.  Kate Gartside's Motion to Dismiss

Ms. Gartside argues that the Court does not have personal jurisdiction over her because she lacks sufficient contacts with Alabama. (Doc. 33). According to Ms. Gartside's affidavit, Ms. Gartside is a resident of London, England, and she has had no direct contact with Alabama while writing the script for the film or otherwise. (Doc. 33-1, pp. 2-4). Mr. Lovingood did not file a response to Ms. Gartside's motion, much less provide substantial evidence that could withstand a motion for a directed verdict. *See, e.g.*, *Carter*, 870 F.2d at 581. Therefore, the Court will dismiss Ms. Gartside for lack of personal jurisdiction. *See, e.g.*, *Cox Enters., Inc. v. Holt*, 678 F.2d 936, 938-39 (11th Cir. 1982) (holding that the court did not have personal jurisdiction over a defendant writer in a libel action by an in-state plaintiff when the writer had never travelled to or contacted anyone in the forum state and therefore had not "purposefully direct[ed]" activities toward the state).

IV.   **CONCLUSION**

For the reasons stated above, the Court **DENIES** Discovery's motion to dismiss for failure to state a claim upon which relief can be granted.  (Doc. 6).  The Court **GRANTS** BBC's motion to dismiss for lack of personal jurisdiction (Doc. 14) and **GRANTS** Kate Gartside's motion to dismiss for lack of personal jurisdiction (Doc. 32).  The Court requests that the remaining parties please file a notice containing an amended proposed scheduling order.

**DONE** and **ORDERED** this September 30, 2015.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE