## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| JUDSON A. LOVINGOOD, } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | **Case No.: 5:14-cv-00684-MHH** |
| } | |
| DISCOVERY COMMUNICATIONS, } | |
| INC., et al., } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION

In 2013, The Discovery Channel broadcast a film that the British Broadcasting Corporation made regarding the Challenger shuttle disaster. Launched in 1986, the Space Shuttle Challenger came apart shortly after takeoff. The shuttle crashed, killing the shuttle's seven crew members. The BBC film entitled "The Challenger Disaster" recounts the investigation following the crash through the eyes of Dr. Richard P. Feynman, a physics professor who was involved in the investigation. (Doc. 60-6, p. 13).

The plaintiff in this action, Dr. Judson A. Lovingood, became involved in NASA's shuttle program in 1969 when NASA instituted the program. (Doc. 60-6, p. 64). In 1986, Dr. Lovingood was the deputy manager of the shuttle projects office at Marshall Space Flight Center, and he was partially responsible for overseeing the development and operation of the propulsion systems for the Challenger shuttle. (Doc. 60-6, pp. 14–15). When President Ronald Reagan established a Presidential

Commission to investigate the cause of the Challenger accident, NASA tapped Dr. Lovingood to testify before the Commission because of the depth of his knowledge regarding the shuttle's design. (Doc. 60-6, p. 64). In this lawsuit, Dr. Lovingood contends that the BBC film that the Discovery defendants broadcast in the United States defames him and places him in a false light. (Doc. 1-1).[1]

The scene in the Challenger film that concerns Dr. Lovingood is short but poignant, especially to Dr. Lovingood. The scene depicts Dr. Lovingood testifying before the Presidential Commission. The actor who portrays Dr. Lovingood represents to the Commission that NASA engineers had calculated, and therefore were aware of, the probability of complete mission failure and the deaths of the members of the Challenger crew. (Doc. 60-26). It is undisputed that there never was such a calculation, and Dr. Lovingood never gave such testimony before the Presidential Commission. Dr. Lovingood contends that the Discovery Channel should have detected the false information in the film and refused to broadcast the film with the defamatory content.

Pursuant to Federal Rule of Civil Procedure 56, the Discovery defendants ask the Court to enter judgment in their favor on Dr. Lovingood's claims. The defendants argue that Dr. Lovingood was a public official and that his status as a public official

---

[1] Dr. Lovingood asserts his claims against three related defendants: Discovery Communications, Inc., The Discovery Channel, and The Science Channel. (Doc. 1-1). For convenience, the Court refers to the defendants as "Discovery Channel" or "the Discovery defendants." Dr. Lovingood also named the British Broadcasting Corporation, The Open University, and writer Kate Gartside as defendants in this action. (Doc. 1-1). The Court previously dismissed Dr. Lovingood's claims against these defendants. (Docs. 30, 36).

requires him to prove by clear and convincing evidence that Discovery acted with actual malice when it broadcast the BBC film containing the false testimony. (Doc. 63, pp. 12–14, 17–20). The defendants contend that on the record before the Court, Dr. Lovingood cannot carry this burden. For the reasons stated below, the Court grants the Discovery defendants' motion for summary judgment.

## I.      SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

## II.    BACKGROUND

When the Challenger accident occurred in 1986, Dr. Lovingood was working as the deputy manager of the space shuttle projects office at NASA's Marshall Space Flight Center.  (Doc. 60-6, p. 14).  Dr. Lovingood had distinguished himself as the individual at NASA who had the greatest institutional knowledge of the shuttle.  (Doc. 60-6, p. 64).  Dr. Lovingood also was one of the few people at NASA who could discuss the shuttle's main engine, the solid booster, and the external tank.  Other engineers could address only one of the three components.  (Doc. 60-6, pp. 63–64).  Given his breadth of knowledge, it comes as no surprise that NASA designated Dr. Lovingood to testify before the Presidential Commission that investigated the crash of the Challenger shuttle.

Dr. Feynman, a Nobel Laureate and physics professor at Caltech, was a member of the Presidential Commission.  He wrote a book about his experience on the commission.  The book is entitled *What Do You Care What Other People Think?*.  (Doc. 60-6, p. 13; *see also* Doc. 63, p. 10; Doc. 65, p. 4).  The BBC's film entitled "The Challenger Disaster" is based on Dr. Feynman's book.  The BBC licensed Discovery to broadcast the film in the United States.  (Doc. 60-1, pp. 2–4; Doc. 63, ¶¶ 17–18; *see also* Doc. 60-9).  The film premiered on The Discovery Channel and The Science Channel on November 16, 2013.  (Doc. 1-1, ¶ 3).

"The Challenger Disaster" film begins with the following message displayed in white letters on a black screen: "This is a true story."[2]  (Doc. 60-26, 1:36).[3]  The text then indicates that the film is based on Dr. Feynman's book "and on interviews with key individuals." (Doc. 60-26, 1:48).  A final line of text states: "Some scenes have been created for dramatic purposes." (Doc. 60-26, 2:06).  All three messages appear in white against a black screen, in the same font, and all three are approximately the same size.  (Doc. 60-26, 1:36–2:10).

The film, which the Discovery defendants describe as a "docudrama," centers on Dr. Feynman's efforts to identify the cause of the Challenger disaster.  (*See generally* Doc. 60-26).[4]  Along the way, Dr. Feynman encounters resistance and secrecy from other members of the Commission and from individuals associated with NASA and the United States government.  (*See generally* Doc. 60-26).  Dr. Feynman persists, and ultimately he leads the Commission to discover that an improperly sealed "O-ring" on the right solid rocket booster caused the crash.  (*See, e.g.*, Doc. 60-26,

---

[2] In his complaint, Dr. Lovingood alleges that the statement, "This is a true story" appears in the opening moments of the film in all caps like this:  "THIS IS A TRUE STORY."  (Doc. 1-1, ¶ 4).  In its opinion denying the Discovery defendants' motion to dismiss, the Court accepted Dr. Lovingood's allegation and stated that the film "begins with the following message displayed in bold print:  'THIS IS A TRUE STORY.'  (Doc. 1-1, ¶ 4)."  When it reviewed the film to evaluate the defendants' motion for summary judgment, the Court learned that the film does not emphasize the text as Dr. Lovingood alleges.

[3] Doc. 60-26 is a DVD of "The Challenger Disaster" film that the Discovery defendants filed with the Court.  Citations to specific time signatures are approximate.

[4] According to the Discovery defendants, a docudrama "is a scripted film that uses actors to portray historical events."  (*See* Doc. 63, ¶ 22; *see also* Doc. 60-8, p. 39).  Rocky Collins, Discovery's executive producer of "The Challenger Disaster," referred to the film as a "fictional drama" in his deposition.  (Doc. 64-12, p. 6).

1:21:50–1:25:01; *see also* Doc. 1-1, ¶ 2; Doc. 60-6, p. 12). In the film, during the course of his investigation, Dr. Feynman reveals that NASA knew of significant risks associated with the O-rings but chose to launch the shuttle anyway. (*See generally* Doc. 60-26).

Dr. Lovingood's claims relate to two scenes in the film. In the first scene, Dr. Feynman eats lunch with two NASA engineers in a cafeteria. Dr. Feynman introduces himself to the engineers and states that he is "on the Commission." (Doc. 60-26, 21:37). One of the engineers replies, "I got nothing to hide." (Doc. 60-26, 21:28). Dr. Feynman then asks, "If I was to ask you engineers—never mind what the managers say, but you guys—given all your experience, what you thought the probability was of an accident on any single launch, what would you say?" (Doc. 60-26, 21:45). The engineers avoid Dr. Feynman's eye. Dr. Feynman says, "If you don't want to say out loud, perhaps you could write down on a piece of paper." (Doc. 60-26, 21:54). The engineers exchange uneasy glances, and the scene cuts away. Later, Dr. Feynman discovers a handwritten note in his coat pocket that reads, "We think Ivory Soap." (Doc. 60-26, 31:50). The audience later learns that "We think Ivory Soap" is a reference to a 19th-century advertising slogan for Proctor & Gamble's "Ivory" soap. (Doc. 60-26, 1:07:44–1:08:14). The slogan touted Ivory soap as 99.44% pure. (*See* Doc. 60-26, 1:07:46).

The second scene portrays Dr. Lovingood and NASA shuttle program manager Lawrence Mulloy testifying before the Presidential Commission. In the scene, Dr.

Feynman asks Dr. Lovingood and Mr. Mulloy, "Can you remind me what NASA calculates the probability of shuttle failure to be? Failure meaning the loss of the vehicle and the deaths of the entire crew." (Doc. 60-26, 1:19:05). The chairman of the Commission invites Dr. Lovingood to answer, and Dr. Lovingood reads from a stack of paper: "Certainly, that would be 1 in 10 to the power of 5." (Doc. 60-26, 1:19:10). The scene proceeds as follows.

> Dr. Feynman: "Really? Would you explain that?"
>
> Dr. Lovingood: "Yes, the probability of mission success is 100%, minus epsilon."
>
> Dr. Feynman: "Epsilon, that's a pretty fancy word. Let's put all that you said there into English. So that's, um, that's one failure in every 100,000 flights. So you claim that the shuttle would fly every day for 300 years before there would be a single failure. That's crazy, I mean, how would you ever even test that?"
>
> Dr. Lovingood: "NASA arrived at that figure because it was a manned flight."
>
> Dr. Feynman: "Because there were people on board, but that is not a scientific calculation, that's a wish. And interesting that the figure is very different from that of NASA's own engineers based on their direct experience and observation of many known component problems, some of NASA's engineers calculate the probability of success as only 99.4%, in other words that's roughly one flight in every 200 will fail."

(Doc. 60-26, 1:19:17–1:20:23).[5]

Both scenes are fabrications. (*See* Doc. 65, pp. 5–11). In reality, the meeting portrayed in the film in the cafeteria took place in a conference room at Marshall Space Flight Cente, and Dr. Lovingood was present. (Doc. 60-6, p. 62). At the

---

[5] Other than in this scene, Dr. Lovingood appears only for a few brief moments in the film.

meeting, Dr. Feynman did not ask what "the probability was of an accident on any single launch." (*See* Doc. 60-6, pp. 62, 66; p. 6, above). Rather, Dr. Feynman asked the engineers to write down the probability of the Challenger mission not being completed because of a failure of the main engine. (Doc. 60-6, p. 66; Doc. 63, ¶6; Doc. 64-1, p. 5; Doc. 65, p. 5). From an engineering perspective, the distinction is significant. Dr. Lovingood testified that, because of a series of safety redundancies that were designed to activate upon a failure of the main engine, the likelihood that a malfunction of the main engine would cause the mission to fail was low. (*See* Doc. 60-6, pp. 44–45). Indeed, the Commission concluded that the main engine functioned properly during the Challenger flight and did not contribute to the crash. (Doc. 60-6, pp. 21–22). In a nod to the Ivory soap slogan, one of the engineers wrote 99.44/100% pure, which Dr. Lovingood "thought was silly," and another engineer wrote 1 in 300. (Doc. 60-6, p. 67; Doc. 64-1, p. 4). Dr. Lovingood provided Dr. Feynman with "the official NASA number," 1 in 100,000. (Doc. 60-6, pp. 72–73).[6]

Like the cafeteria scene, the scene that depicts Dr. Lovingood testifying before the Presidential Commission "never took place in reality and truth." (Doc. 65, p. 11). Dr. Lovingood did not testify "that the probability of total mission failure was 1 in 100,000," and "[n]o engineer ever said it was 1 in 200." (Doc. 1-1, ¶ 7). The probability of such an event, says Dr. Lovingood, was "[n]ever addressed at all by

---

[6] Dr. Lovingood testified that he provided Dr. Feynman with the official NASA report that contained the basis for the 1-in-100,000 estimate after the meeting at Marshall Space Flight Center. (Doc. 60-6, p. 73).

NASA or any of the engineers." (Doc. 60-6, pp. 346–47; *see also* Doc. 65, pp. 10–11).

In short, Dr. Lovingood did provide Dr. Feynman with a 1-in-100,000 estimate, but he provided the estimate at Marshall Space Flight Center, not before the Presidential Commission, and the estimate was of the probability that a main-engine malfunction would cause the Challenger mission to fail, not of the probability of "the loss of the vehicle and the deaths of the entire crew." In addition, NASA engineers did provide Dr. Feynman with a 1-in-200 estimate, but the estimate, like Dr. Lovingood's, was of the probability that a main-engine malfunction would cause the mission to fail, not of the probability of "an accident on any single launch." *See* pp. 6, 8, above. Mr. Collins, the executive producer of the Challenger film for the Discovery defendants, has acknowledged that "[t]he exact dialogue that you see in the film . . . was not actually spoken by Lovingood [or anyone else] in front of the Commission." (Doc. 64-12, p. 8; Doc. 65, pp. 4–5).

The suggestion of the film as a whole, and of these two scenes in particular, according to Dr. Lovingood, is that Dr. Lovingood ignored significant risks associated with the Challenger mission, lied under oath regarding NASA's knowledge of the risks, and participated in NASA's efforts to conceal the cause of the crash. (*See* Doc. 60-6, pp. 44–45). It is fair to say that the tone of the film is not complimentary of NASA. Dr. Lovingood asserts that the film defames him and places him in a false

light, and he asks the Court to award him compensatory and punitive damages. (Doc. 1-1, p. 74).

## III. DISCUSSION

### A. Dr. Lovingood's defamation claim

To establish a prima facie case of defamation under Alabama law, a plaintiff must show: "[1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Ex parte Bole*, 103 So. 3d 40, 51 (Ala. 2012) (quoting *Ex parte Crawford Broad. Co.*, 904 So. 2d 221, 225 (Ala. 2004)) (emphasis and internal quotation marks omitted). If a court determines that a plaintiff in a defamation action is "a public official, public figure, or limited-purpose public figure," then the plaintiff must establish by clear and convincing evidence "that the defamatory statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard to whether it was false or not." *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 333 (Ala. 2007) (citing *New York Times, Co. v. Sullivan*, 376 U.S. 254, 280 (1964)); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 162–164 (1967) (internal quotation marks omitted).

This case concerns Discovery's republication of false information concerning Dr. Lovingood and the engineers who worked on the Challenger mission. "[O]ne who

repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." Restatement (Second) of Torts § 578. "[T]he republisher of a defamatory statement made by another remains subject to liability (Restatement (Second) of Torts § 578 (1977)), but he cannot be held liable unless he himself knew at the time when the statement was published that it was false, or acted in reckless disregard for its truth or falsity." *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1145 (10th Cir. 2000) (quoting *Catalano v. Pechous*, 419 N.E.2d 350, 361 (Ill. 1980)) (internal quotation marks omitted).[7]

The Discovery defendants argue that they are entitled to judgment as a matter of law on Dr. Lovingood's defamation claim because Dr. Lovingood is a public official, and he cannot prove by clear and convincing evidence that the Discovery defendants acted with actual malice when they broadcast the film that contains false information about Dr. Lovingood. (Doc. 63). On the record in this case, the Court agrees that the defendants are entitled to judgment on Dr. Lovingood's claims.[8]

### 1.    Dr. Lovingood's status

---

[7] The Court has located no Alabama Supreme Court or Alabama Court of Civil Appeals decisions concerning republication of defamatory material; however, the Alabama Supreme Court follows the Restatement (Second) of Torts in defamation cases, and many states have adopted the Restatement standard regarding republication. *See, e.g., Hillman v. Yarbrough*, 936 So. 2d 1056 (Ala. 2006); *Larrimore v. Dubose*, 827 So. 2d 60, 61 (Ala. 2001); *Catalano v. Pechous*, 419 N.E.2d 350 (Ill. 1980).

[8] Because the Court finds that the Discovery defendants are entitled to summary judgment for the reasons stated below, the Court does not discuss the defendants' alternative arguments in favor of their motion for summary judgment.

Whether Dr. Lovingood is a public official, a public figure, or a private individual is a question of law for the trial judge. *See Ex parte Rudder*, 507 So. 2d 411, 416 (Ala. 1987); *see also Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966); *Barnett v. Mobile Cty. Personnel Bd.*, 536 So. 2d 46, 54 (Ala. 1988). The record in this case, viewed in the light most favorable to Dr. Lovingood, demonstrates that Dr. Lovingood is a public official.

Although it is not clear "'how far down into the lower ranks of government employees the 'public official' designation'" extends, the United States Supreme Court has held that the designation "applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt*, 383 U.S. at 85 (quoting *New York Times*, 376 U.S. at 283 n. 23). "Where a position [] has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the *New York Times* malice standards apply." *Rosenblatt*, 383 U.S. at 86. According to the Alabama Supreme Court, "[a] 'public official' must hold a position that would invite public scrutiny of the person holding it, apart from the scrutiny and discussion occasioned by the allegedly defamatory remarks." *Barnett*, 536 So. 2d at 54.

In *Barnett*, the Alabama Supreme Court ascribed public official status to a former town clerk who "had the primary responsibility for organizing and issuing the

payroll for the town." 536 So. 2d at 47, 54. Citing *Rosenblatt*, the Court based its determination on the town clerk's role as "a governmental employee who had substantial responsibility for, or control over, the conduct of governmental affairs." *Id.* (citing *Rosenblatt*, 383 U.S. at 85). In *Warren v. Birmingham Board of Education*, the Alabama Court of Civil Appeals found that the principal of an elementary school was a public official, "similar to the . . . town clerk in *Barnett*." 739 So. 2d 1125, 1129, 1133 (Ala. Civ. App. 1999). In *Stewart v. Town of Zolfo Springs, Florida*, the United States District Court for the Middle District of Florida found that a municipal police officer was a public official and applied the *New York Times* actual malice standard to its analysis of the officer's defamation claim. 1997 WL 689448, *3 (M.D. Fla. Aug. 27, 1997).

Courts outside the Eleventh Circuit also have attributed public official status to positions within the "lower ranks of government employees." *Rosenblatt*, 383 U.S. at 85; *see, e.g.*, *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069 (5th Cir. 1987) (attributing public official status to county law enforcement officers); *Price v. Viking Penguin, Inc.*, 676 F. Supp. 1501 (D. Minn. 1988) (attributing public official status to an FBI agent); *see also* L. Tribe, *American Constitutional Law* 866 (2d ed. 1988) ("[T]he term 'public official' now embraces virtually all persons affiliated with the government, such as most ordinary civil servants, including public school teachers and policemen.").

There is no doubt that NASA's space program is a matter of public interest, and NASA employees involved in the design of NASA's space shuttles invite public scrutiny of their work, particularly with respect to the shuttles' ability to provide safe passage to the members of the shuttles' crews. As the deputy manager of the space shuttle projects office at Marshall Space Flight Center, Dr. Lovingood was partially responsible for overseeing the development and operation of the propulsion systems for the Challenger shuttle. (Doc. 60-6, pp. 14–15). After the crash, Dr. Lovingood was "the Marshall lead man in briefing the Presidential Commission on the space shuttle main engine, the solid booster, and the external tank." (Doc. 60-6, p. 63). Dr. Lovingood testified that he "was considered to be the person who knew the most about the space shuttle." (Doc. 60-6, p. 64).

Thus, Dr. Lovingood was a government employee who had "substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt*, 383 U.S. at 85. Dr. Lovingood's roles in the Challenger mission and in the Commission's subsequent investigation were of particular importance, such that "the public has an independent interest in [Dr. Lovingood's] qualifications and performance." *Rosenblatt*, 383 U.S. at 86; *see also Barnett*, 536 So. 2d at 54.[9]

_____

[9] Dr. Lovingood retired from NASA in 1988. (Doc. 60-6, p. 222; *see generally* Doc. 60-6, pp. 222–225). For purposes of this litigation, he did not lose his status as a public official when he retired. *See Zarangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069 (5th Cir. 1987) (explaining that the court of appeals located "no cases holding that public official status erodes with the passage of time" and that "[o]ther courts have held that ex-public officials must prove that 'actual malice' prompted speech concerning their in-office activities. *See, e.g., Rosenblatt v. Baer,* 383 U.S. 75, 87 n. 14, 86 S.Ct. 669, 677 n. 14, 15 L.Ed.2d 597 (1966); *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d

Consequently, the Court finds as a matter of law that Dr. Lovingood is a public official.[10]

### 2. Actual malice

Because he is a public official for purposes of this litigation, to survive the Discovery defendants' summary judgment motion, Dr. Lovingood must be able to show by clear and convincing evidence that the Discovery defendants acted with actual malice when they broadcast in the United States a BBC film that falsely portrays Dr. Lovingood's testimony before the Presidential Commission and NASA engineers' conversation with Dr. Feynman at Marshall Space Flight Center. *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 666 (1989).

"[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns*, 491 U.S. at 666. Instead, in a defamation action concerning a public official, the public official must be able to prove by clear and convincing evidence that the defendant acted with

495 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); *Arnheiter v. Random House, Inc.,* 578 F.2d 804 (9th Cir.1978).").

[10] Dr. Lovingood argues that he is a private citizen rather than a public figure or a limited purpose public figure, but Dr. Lovingood does not address Discovery's arguments that he is a public official. (*See* Doc. 63, pp. 12–14; Doc. 65, pp. 19–23, 30; Doc. 67, pp. 3–4). "In defamation actions, a plaintiff is [] a private person, a public official, or a public figure, either in general or for the limited purpose of a particular controversy." *Cottrell v. Nat'l Collegiate Athletic Ass'n*, 975 So.2d 306, 333 (Ala. 2007). Public officials hold governmental office, whereas public figures "seek the public's attention" or gain it "by reason of the notoriety of their achievements." *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974); *see also Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967) (distinguishing between a public official and a public figure and extending *New York Times* protection to the latter). Dr. Lovingood's arguments that he is not a public figure do not diminish his role as a public official.

reckless disregard of the truth. *Id.*; *see also Cottrell*, 975 So. 2d at 333 (citing *New York Times*, 376 U.S. at 280). A defendant acts with reckless disregard for the falsity of allegedly defamatory remarks when the defendant "in fact entertained serious doubts as to the truth of [its] publication . . . or acted with a 'high degree of awareness of . . . probable falsity.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) and *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). "The meaning of terms such as 'actual malice'- and, more particularly, 'reckless disregard'" are "not readily captured in one infallible definition." *Harte-Hanks Commc'ns*, 491 U.S. at 686 (some internal quotation marks and citation omitted). "Rather, only through the course of case-by-case adjudication" may a court "give content to these otherwise elusive constitutional standards." *Id.*

The United States Supreme Court and the Alabama Supreme Court have provided some guidance regarding the nature of the evidence that a public official must present to prove by clear and convincing evidence that the defendant knew that information that the defendant republished about a public official was false or that the defendant republished the information about the official in reckless disregard for the truth or falsity of the information. Extending the rationale of *Cottrell* to republication, to create a jury question, a public official must present sufficient evidence that the defendant knew that the republished information was fabricated, realized that the information was "so inherently improbable that only a reckless man would have put [it] in circulation," or recognized that the information came from "a source that the

defendant had obvious reasons to doubt, such as an unverified anonymous telephone call." *Cottrell*, 975 So. 2d at 349 (citations, internal quotation marks, and emphasis omitted). Per *Harte-Hanks Commc'ns*, the evidence upon which a public official relies must show "more than a departure from reasonably prudent conduct." *Harte-Hanks Commc'ns*, 491 U.S. at 688. Instead, there must be evidence that indicates that the defendant "'entertained serious doubts as to the truth of [the] publication.'" *Harte-Hanks Commc'ns*, 491 U.S. at 688 (quoting *St. Amant*, 390 U.S. at 731). The standard is subjective. *Harte-Hanks Commc'ns*, 491 U.S. at 688; *Cottrell*, 975 So. 2d at 349.

When, as in this case, the public official's claim rests on a failure to investigate theory, the "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Commc'ns*, 491 U.S. at 688. Instead, the official must show that the defendant "purposeful[ly] avoid[ed] [] the truth." *Id.* at 692; *see also Cottrell*, 975 So. 2d at 349 ("[T]he failure to investigate does not constitute malice, unless the failure evidences purposeful avoidance, that is, an intent to avoid the truth.") (citations and internal quotation marks omitted).

In *Harte-Hanks Commc'ns*, the United States Supreme Court found that evidence of conduct that amounted to willful ignorance of objective information that contradicted a source's charges about a judicial candidate supported a jury verdict for the candidate and against the defendant newspaper that published an article maligning

the candidate. The article stated that the candidate offered jobs and a trip to Florida to certain individuals who were in a position to discredit the candidate's opponent. *See Harte-Hanks Commc'ns*, 491 U.S. at 660. The Supreme Court found that evidence that "no one at the newspaper took the time to listen" to interview tapes that were available to the newspaper and undermined the source's charges against the candidate supported a finding that "the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the source's] charges." *Id.* at 692.

In *Harte-Hanks Commc'ns*, the Supreme Court likened the situation before it to the circumstances that supported a finding of actual malice in *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967). The Supreme Court explained:

> In *Butts* the evidence showed that the Saturday Evening Post had published an accurate account of an unreliable informant's false description of the Georgia athletic director's purported agreement to "fix" a college football game. Although there was reason to question the informant's veracity, . . . the editors did not interview a witness who had the same access to the facts as the informant and did not look at films that revealed what actually happened at the game in question. This evidence of an intent to avoid the truth was not only sufficient to convince the plurality that there had been an extreme departure from professional publishing standards, but it was also sufficient to satisfy the more demanding *New York Times* [actual malice] standard . . . .

*Harte-Hanks Commc'ns*, 491 U.S. at 692–93. As the Eleventh Circuit Court of Appeals held in *Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir. 1983), when a party has reason to question the neutrality of the source of its information yet publishes information that is not "'hot news,' that is, information that must be printed

immediately or it will lose its newsworthy value," without taking the time to examine available resources that would permit verification of the information being published, a jury question exits regarding the publisher's intent. 720 F.2d at 645.

Here, there is nothing in the *Challenger* film that is "hot news." The film portrays events that occurred more than two decades before the BBC made the film. The evidence, viewed in the light most favorable to Dr. Lovingood, shows that The Discovery Channel knew that in the *Challenger* film, the BBC embellished or perhaps even fabricated aspects of the actual events for the film because the film was a docudrama. Rocky Collins, the executive producer of the film for The Discovery Channel, watched the film before Discovery aired the film in the United States. (Doc. 60-7, p. 74). The first few frames of the film contain the statement, "Some scenes have been created for dramatic purposes." (Doc. 60-26, 2:06).

Discovery Channel obtained the film from the BBC via a five-year "Master First Look, Co-Production and Licence [*sic*] Agreement" pursuant to which Discovery Channel agreed to pay the BBC $22 million annually to co-produce programming. (Doc. 60-9; *see also* Doc. 60-1, ¶ 7; Doc. 63, pp. 18–19 n. 1). Although the agreement gave the BBC "final artistic and editorial control" of each co-produced program, and although the BBC expressly warranted that, "to the best of its knowledge and belief (having exercised due diligence in its enquiries)," no co-produced program would "defame any individual or entity," the agreement also required Discovery Channel and the BBC to consult "on the form and content" and

"all creative aspects" of each program, "throughout all phases of production," and "tak[e] into account the requirements of [Discovery's] audience." (Doc. 60-9, p. 20, ¶ 15.1; p. 28, ¶ 20.1.8). In addition, the agreement gave Discovery Channel the limited right to edit a program before publishing the program in the United States, and the agreement prohibited Discovery from using any program produced pursuant to the agreement "in any manner . . . which is defamatory or invades the privacy of any person." (Doc. 60-9, pp. 20-21, ¶¶ 15.5–15.8).

Mr. Collins testified that he relied on the BBC "to undertake [] diligent research in keeping with the best standards and [he] relied on them and expected them to do all of their work." (Doc. 64-12, p. 17). Yet, Mr. Collins recognized that as the executive producer of Discovery's version of the film, it was his job "to make sure" that the BBC was performing its due diligence. (*See* Doc. 64-12, p. 17). According to Mr. Collins, the BBC had "satisfactory answers" every time he asked about the potential legal consequences of a given aspect of the film. (*See* Doc. 64-12, p. 17). Mr. Collins testified that he "had absolutely no reason to believe that the [BBC] did not do [its] job." (Doc. 64-12, p. 17).[11]

---

[11] Discovery Channel argues that Mr. Collins's efforts were adequate, and the company offered testimony from James Hirsch to prove the point. Mr. Hirsch testified that it was customary in the entertainment industry for Discovery Channel to "rely[] on the [BBC] to 'get it right,' both legally and creatively." (Doc. 60-28, p. 5). Mr. Hirsch's professional biography is located at Doc. 60-28, pp. 11–14. Dr. Lovingood filed a motion to exclude Mr. Hirsch's testimony on grounds that the testimony does not satisfy the requirements of Federal Rule of Evidence 702. (Doc. 50). Because the Court has not relied on Mr. Hirsh's opinion in reaching its decision, the Court denies Dr. Lovingood's motion to strike because the motion is moot.

Nevertheless, it is undisputed that Mr. Collins had available to him two resources that he could have used to verify the accuracy of scenes in the film. He could have consulted Dr. Feynman's book. Doing so would have revealed that engineers gave Dr. Feynman the Ivory soap estimate of success at Marshall Space Flight Center, not in a cafeteria; Dr. Lovingood participated in the conversation; and the discussion concerned the possibility of main engine failure (a statistic that NASA's engineers could calculate and guard against), not mission failure. Mr. Collins never questioned the BBC about the scene involving Dr. Lovingood. (Doc. 60-7, pp. 144–45). Mr. Collins only skimmed Dr. Feynman's book, so he did not realize that the discussion between Dr. Lovingood and Dr. Feynman about the probability of a main engine malfunction took place at Marshall Space Flight Center in Huntsville rather than before the Presidential Commission. (Doc. 60-7, pp. 146– 49). After reading the book, Mr. Collins acknowledged that there was a "substantial difference" between the book's depiction of the encounter between Dr. Feynman and Dr. Lovingood and the film's depiction of the event. (Doc. 60-7, pp. 148–49). There is a transcript of Dr. Lovingood's testimony before the Presidential Commission. (Doc. 60-6, pp. 91–92). There is no evidence that Mr. Collins reviewed that transcript to determine whether the BBC's portrayal of Dr. Lovingood's testimony was accurate. In short, Mr. Collins made virtually no independent effort to determine whether the BBC accurately portrayed Dr. Lovingood in the docudrama.

Although Discovery Channel clearly had the means and the opportunity to be more proactive in its monitoring of the content of the Challenger film, and a jury potentially could infer from the evidence that Discovery Channel willfully avoided the opportunity, the Court finds on the record in this particular case that the evidence that Dr. Lovingood has offered does not satisfy the "elusive constitutional standard" for actual malice. A number of circumstances compel the Court's conclusion.

First, unlike *Harte-Hanks Commc'ns* and *Hunt*, cases in which the United States Supreme Court and the Eleventh Circuit Court of Appeals found that trial courts properly allowed juries to resolve factual disputes concerning the defendant publisher's intent, this case does not involve a newspaper article and a reporter's potentially unreliable sources. This case concerns a docudrama. The "drama" aspect of the film presupposes that aspects of the historical event are fictionalized in the film for entertainment purposes. *See Davis v. Costa-Gavras*, 654 F.Supp. 653, 658 (S.D.N.Y. 1987) (explaining that the docudrama genre "utilize[s] simulated dialogue, composite characters, and a telescoping of events occurring over a period into a composite scene or scenes" whereas a documentary is "a nonfictional story or series of historical events portrayed in their actual location; a film of real people and real events as they occur. A documentary maintains strict fidelity to fact."). Thus, changing the location in which a conversation took place and reducing the number of people involved in the conversation is not the sort of false information that a

docudrama's co-producer would be expected to detect and identify as potentially libelous material.

The falsification of sworn testimony is another matter. Such conduct has a significant potential to damage the reputation of the individual depicted in the historical dramatization. Under certain circumstances, a jury question concerning actual malice could exist where a defendant published—or republished—a false reenactment of sworn testimony where the defendant had available to it the means to verify the accuracy of the dramatic depiction of the testimony but willfully or recklessly disregarded the opportunity.

In this case though, there is nothing so improbable in the scene of Dr. Lovingood's testimony before the Presidential Commission that would have prompted Mr. Collins to obtain a transcript of the hearing to investigate the accuracy of the scene. Although it is abundantly clear to Dr. Lovingood and to his colleagues from NASA that the scene contains false information, there is nothing that would prompt an observer lacking Dr. Lovingood's expertise to recognize the significant engineering distinction between main engine failure and mission failure. The analysis is not altered by the fact that Mr. Collins now acknowledges in retrospect and in light of this litigation that the statements attributed to Dr. Lovingood in the *Challenger* film are inaccurate because the record contains no evidence that indicates that the distinction was discernible when Mr. Collins first reviewed the movie. And unlike the evidence in *Harte-Hanks Commc'ns* and *Hunt* that suggested that the reporters' sources were

unreliable, there is no evidence in the record here that the BBC is not a reputable producer of television programs and movies. Therefore, there is no evidence from which jurors could reasonably infer that the Discovery defendants had reason to doubt the accuracy of the scenes in the *Challenger* film or that the defendants' failure to do more to investigate the accuracy of the two scenes at issue evidences "an intent to avoid the truth." *See* p. 17, above. The evidence in the record may rise to the level of negligence, but it does not go further.

Consequently, the Discovery defendants are entitled to judgment as a matter of law on Dr. Lovingood's defamation claim.

## B.    Dr. Lovingood's false light invasion of privacy claim

To be subject to liability for the tort of false light invasion of privacy, a defendant must have "knowledge of or act[] in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Ex parte Bole*, 103 So. 3d at 51 (citations and internal quotation marks omitted). Because, as discussed above, Dr. Lovingood has not provided evidence that shows that Discovery acted recklessly when it broadcast "The Challenger Disaster," Discovery is entitled to judgment as a matter of law on Dr. Lovingood's false light invasion of privacy claim. *See Smith v. Huntsville Times, Co., Inc.*, 888 So. 2d 492, 496 n. 1 (Ala. 2004) (explaining that the "same standard applies to all of [the plaintiff's] claims, regardless of whether they are stated as 'defamation' or 'false light invasion of privacy'").

## IV.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** the Discovery defendants' motion for summary judgment with respect to Dr. Lovingood's claims for defamation and false light invasion of privacy.  (Doc. 62).  The Court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this August 1, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE